Steffen, C. J.,
with whom Springer, J., joins, dissenting:
I agree that there was no double jeopardy violation in the proceedings below but conclude that the district court was correct in determining that due process violations justified granting the petitions for writs of habeas corpus and the dismissal of the criminal counts against Fullerton and Bennett with prejudice. I therefore dissent.
It is apparent to me that Judge Agosti surveyed with justifiable alarm the number and nature of intersecting factors between the civil proceeding and receivership against Fullerton and Bennett on the one hand, and the criminal proceedings resulting in their respective indictments on the other. After evaluating these factors, the district judge concluded that it would not be possible to clothe any criminal convictions against the beleaguered inventor and his associate with sufficient indicia of due process to satisfy constitutional scrutiny. I agree.
The State of Nevada, through the Attorney General, filed a civil complaint for securities fraud and the appointment of a receiver against Fullerton, various corporations and Bennett.[1] *1099 District Judge Stone, who presided over the securities fraud and receivership case, determined that there was no fraud and that Fullerton, the inventor of what appears to be a highly utilitarian product known as a “zip nut,” was simply a poor businessman. Although it is unnecessary to repeat the factual and procedural recitals in the majority opinion, it should be emphasized that the receiver, Matthew Callister, “took possession of all of Fullerton’s and Bennett’s personal papers, questioned them regarding their sources of income and expenditures, and took control of all personal and corporate bank accounts, requiring respondents to also give him monthly financial reports.”
The civil action eventuated in a consent order that paved the way for a merger of a number of Fullerton’s corporations and a reorganization plan that were designed to facilitate the licensing, manufacture and distribution of the zip nut under the apparent operative control of investor/attorney John Schell, who had represented the defendants in the civil proceeding and receivership. Zip Nut, Inc. was to be the vehicle through which the product would be marketed and investors would be made whole. As a result, Zip Nut, Inc. was released from the receivership, but Fullerton and Bennett remained under the control and monitoring of the receiver.
At a hearing held before Judge Stone on November 7, 1991, the judge repeated his earlier observations that “I don’t think Mr. Fullerton is a crook, I think he is a lousy businessman, but he has not intentionally tried to deprive anything of anybody [sic], and that’s the bottom line here.” Judge Stone eventually filed his affidavit in the criminal proceedings describing the intended effect of the two consent orders he issued in the civil action, and their factual underpinnings. In pertinent part, his affidavit declared:
3. After extensive hearings, conferences with the attorneys, review of many documents, affiant determined that a prima facie showing of fraud by Robert Fullerton in his dealings with the First Phoenix investors did not exist. On two occasions, affiant made statements to this effect in. open court to the assembled attorneys and investors.
4. The foregoing finding was essential to continue the civil proceedings in the manner they were conducted. This determination that there was no fraud necessarily led to the court orders consolidating the several corporate entities into Zip Nut, Inc., allowing Robert Fullerton to retain a majority ownership interest in Zip Nut, Inc., and the election offered to the First Phoenix investors to accept stock in Zip Nut, Inc. or a promissory note by Zip Nut, Inc. in an amount equal to their investment plus interest.
*1100 5. If the State of Nevada or any other party to the civil action had proffered prima facie evidence of fraud, affiant would not have proceeded with the case in the manner above-described. The Deputy Attorney General in the civil case told me on at least one occasion in chambers that no criminal action would be filed by the Slate in this matter.[2] If the State of Nevada had informed affiant that it was going to proceed with a criminal prosecution of Robert Fullerton for the same acts and conduct which was alleged in the civil action, affiant would have taken measures to stay the civil action to ensure against a conflict in the proceedings.
7. Affiant was not informed that the receiver, Matthew Callister, had been subpoenaed to testify before the grand jury. If affiant had been so informed prior to his appearance, affiant would have ordered the subpoena quashed.
In seeking habeas relief on double jeopardy and due process grounds, and a dismissal of charges based upon prosecutorial misconduct, respondents brought a number of interesting and rather compelling facts to light. In support of the motion to dismiss, Fullerton and Bennett postulated that the Deputy Attorney General, Grenville Pridham, may have received privileged information from attorney John Schell either directly or through the receiver or another attorney. Pridham’s denials notwithstanding, several factors remain a thorn in the State’s side.
First, it is worthy of emphasis that attorney John Schell was not only an investor in First Phoenix, he was one of the attorneys who represented respondents in the civil action and receivership brought by the Attorney General. As noted by the majority, respondents’ brief indicated that Schell testified “that he had advised Fullerton that sales of First Phoenix stock did not violate the Utah injunction, and that Fullerton was not required to apprise, the First Phoenix investors of either the Utah injunction or the assignment to Crescent Products since neither posed a risk *1101 to the investors.”[3] Apparently Schell saw the economic potential of the zip nut, for respondents’ recitals indicate that Schell (who had been given notice of the intent to seek indictment by Pridham because he believed Schell represented Fullerton) had become president of Zip Nut, Inc., had terminated his representation of the respondents, and was seeking to take control of the corporation from Fullerton and with it the right to proceed with the development and marketing of the zip nut. It certainly must be presumed that Schell was totally knowledgeable about all aspects of respondents’ activities with the patented product and the corporate entities connected to the product.
Although Pridham denied consulting with Schell and Callister in the preparation of the indictment or criminal complaint, Fullerton and Bennett obtained evidence strongly suggesting that Pridham had in fact worked very closely with Schell through attorney Dominic Gentile, the attorney whom Schell had allegedly retained to represent Zip Nut, Inc., in the preparation of criminal charges against respondents. The evidence consisted of a billing statement sent by Gentile’s law firm to the attention of Schell, charging Zip Nut, Inc. for services rendered. This statement (which allegedly was purloined from the offices of Zip Nut, Inc.) indicated that Gentile, in representing Schell’s interests as president of Zip Nut, Inc., had assisted Pridham in preparing the criminal action against Schell’s former clients (and apparent competitors for control in the marketing of the zip nut). The statement evinces numerous telephonic and personal conferences between Schell, Gentile, and prosecutor Pridham. As a meaningful example noted by the majority, on November 12, 1992, Gentile’s activities were characterized on the statement as “Telephone conf. with John Schell; telephone conference with Grenville Pridham; commenced preparation by reviewing documents received from Schell; legal research re best RICO approach.” Additional notations, also identified in the majority opinion, included: (1) an entry for November 13, 1992, indicating that Gentile held a “conference with Grenville Pridham at his office and reviewed his witness list and original draft of proposed indictment;” (2) an entry for November 16, 1992, indicating that Gentile conducted “Legal research and telephone conferences with Grenville Pridham re eliminating most of the alternative RICO counts and settling upon one or two solid ones. Substantial factual discussion during these conversations;” (3) an *1102 entry for November 17, 1992, indicating that Gentile held “multiple telephone conferences with John Schell and Grenville Pridham;” and (4) an entry bearing what appears to be an erroneous date of November 19, 1992 (the indictment against respondents was filed on November 18, 1992), indicating that Gentile had conferred with Pridham by telephone “re modification of Proposed Indictment.”
The foregoing contacts between Fullerton’s former counsel and intended successor, Schell, and Dominic Gentile, the attorney retained by Schell to represent the interests of Zip Nut, Inc. (and hence Schell’s own interests) and prosecutor Pridham, reflect a high level of cooperation among individuals who had direct access, through Schell, to privileged information received by Schell during his representation of Fullerton. Moreover, appearances of impropriety increase with the realization that Schell stood to personally benefit from helping to separate his former client, Fullerton, from the zip nut which Fullerton had invented and protected by patent.
In addition to the foregoing, the testimony of the receiver, who had been appointed at the behest of the Attorney General in the civil proceeding, before the grand jury was an added factor that caused Judge Agosti to comment that:
it is inappropriate to utilize the testimony of a receiver when the receiver was appointed at the State’s behest, and then thereafter manipulated to obtain information in order to make a criminal prosecution work. In other words, to circumvent the due process rights of these defendants . . . [t]he receiver went out and just seized everything . . . [and] was subsequently subpoenaed .... [Whereas] [t]here would have to be an up-front criminal prosecution going on to get a search warrant.
As the majority opinion observes, Judge Agosti obviously agreed that the civil proceeding had been used as a subterfuge to develop evidence for a criminal prosecution.
Judge Agosti’s order granting respondents’ petitions for writ of habeas corpus and motion to dismiss essentially coincided with her oral recitations at the hearing:
Among the remedies sought by the state [in its civil action] was forfeiture of a device commonly known as the “Zip Nut,” ... as well as . . . stock in the several corporate entities .... During the course of the civil case, both of the Defendants provided information ... to the Receiver . . . the prosecutor [has] acknowledged . . . that this seizure of Defendants’ papers and their interviews would have had to comport with the Fourth and Fifth Amendments of the Constitution had a criminal prosecution been pending.
*1103 After the Court had made significant determinations in the civil case against the State’s interest ... the Attorney General decided to pursue this criminal action[] . . . [and] filed a criminal complaint in which the same alleged fraudulent sales transactions of First Phoenix, Inc. securities were charged against the Defendants. The complaint . . . sought forfeiture of the Defendants’ property and Mr. Fullerton’s patent. . . . [B]ased in significant part upon the testimony of the Receiver ... an Indictment was returned in November 1992. Also, it is undisputed that the Deputy Attorney General had several substantive consultations with an attorney retained by the Defendants’ former attorney [in the civil matter], John Schell, regarding the criminal charges .... It is undisputed that these consultations occurred during the time John Schell [as President of Zip Nut, Inc.] was contesting Robert L. Fullerton’s rights to the patent and that forfeiture of the patent and the Defendants’ property would inure to the benefit of John Schell. These consultations make manifest the Attorney General’s conflict of interest in that this criminal prosecution is an attempt by the State to satisfy civil litigants and to obtain for them by the criminal action that which the State has been unable to obtain in the civil case. [Accordingly] the Court makes the following conclusions of law:
The manner in which the State has proceeded against the Defendants through the civil case and then the criminal case has violated the Defendants’ rights under the Due Process of Law Clause and the Double Jeopardy Clause. Therefore, all remaining criminal charges in the Indictment are dismissed with prejudice.
If this conclusion is reversed and the criminal action reinstituted, the Nevada Attorney General’s Office is disqualified to prosecute it.
The majority has concluded that the prosecutor’s use of the civil receiver did not adversely impact respondents’ due process rights. I do not agree, especially when viewed in combination with the attorney general’s rather extensive involvement with Fullerton’s former counsel, John Schell, through Schell’s surrogate, attorney Dominic Gentile.[4]
*1104 The United States Supreme Court, in United States v. Kordel, 397 U.S. 1 (1970) affirmed that “[t]he Court of Appeals was correct in stating that ‘the Government may not use evidence against a defendant in a criminal case which has been coerced from him under penalty of either giving the evidence or suffering a forfeiture of his property.’ ” Id. at 13. If Fullerton and Bennett did in fact agree to the appointment of a receiver, as they assert, they apparently did so in order to retain some interest in the assets which the State’s complaint sought to secure from them. The evident alternative to the receiver appeared to be the complete forfeiture of any hoped-for future interest in their valuable assets, including the zip nut patent. Moreover, the Kordel Court stated that
where no one [in the company] can answer the [civil] interrogatories addressed to the corporation without subjecting himself to a “real and appreciable” risk of self-incrimination [] ... we may assume that in such a case the appropriate remedy would be a protective order . . . postponing civil discovery until termination of the criminal action.
Id. at 8-9. This is, of course, pertinent in light of Judge Stone’s affidavit stating that he would have postponed the civil matter, and quashed the appearance of the receiver in the criminal matter, had he known the criminal matter was pending.
Even more germane here perhaps, is the ruling in Kordel rejecting the offenders’ argument that their due process rights had been violated. The Court noted that “[w]e do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution . . . .” Id. at 11-12.
Assuming, logically, that civil seizure is tantamount to civil discovery proceedings, respondents’ civil rights may have been violated if the civil receivership was used solely to obtain evidence for the criminal case, or if the respondents were never advised, upon stipulating to and cooperating with the receiver, that a criminal case might be pending. Applying these factors to the instant case, Judge Agosti’s statements at oral argument seem to indicate her belief that the civil case may have been brought to obtain evidence for the criminal prosecution, a belief that is certainly not without support.
There is, moreover, an evidentiary basis in the record for concluding that respondents were not advised during the receivership that a criminal prosecution was contemplated. For example, Judge Stone’s affidavit indicates that opposite assurances were *1105 given. It is also clear, from his own statements in the record, that the prosecutor refused to inform respondents that criminal charges were going to be brought, although he was personally and “pointedly” asked the question on the very day that he filed the criminal complaint.[5]
Although no focused evidentiary hearing was held by the district court to determine whether the State filed the civil action solely as a means of providing evidence for the criminal prosecution, or at what point respondents were aware of the possibility of criminal charges, there is nevertheless support for the conclusion that Pridham’s use of the civil receiver as a source of information and testimony deprived respondents of their rights to due process.
The receiver was able to seize information and evidence without a warrant, which was later relied upon by the prosecutor. In the absence of the civil action, the State would have had to obtain a warrant to secure the same information and evidence to support criminal proceedings against respondents. Kordel lends support for the proposition that the complex of factors existing here violates due process since there is record evidence indicating that the State failed to advise respondents in the civil proceeding that it contemplated their criminal prosecution. I must thus conclude that the ruling of the district court is entitled to deference and affirmance for the reason stated. Where, as here, there is conflicting evidence, this court should not interfere with the findings of the district court.
*1106 For the reasons discussed above, I find ample reasons for deferring to the two district court judges who heard the evidence and observed the demeanor of witnesses and counsel in the civil and criminal proceedings against Fullerton and Bennett, and would affirm Judge Agosti’s rulings granting habeas corpus and dismissing the criminal counts against respondents with prejudice. It strongly appears that when the State failed to wrest Fullerton’s patented invention from him through the civil action and receivership, it then turned to a criminal proceeding based upon the same facts in order to accomplish what it failed to accomplish in the civil matter. I believe that both Judge Stone and Judge Agosti saw through to the heart of the matter and should be affirmed on grounds that respondents have been denied their rights to due process. I therefore dissent.

As noted by the majority, Bennett and other corporate defendants were later added by amendment to the civil complaint.

This averment is contested by the Deputy Attorney General who handled the civil case against respondents, in an affidavit filed March 29, 1993. This affidavit refers to a December 6, 1991, application and order submitted by Callister and signed by Judge Stone which mentioned the possibility of criminal charges being brought. However, respondents allege, persuasively, that this reference to the possibility of criminal charges prompted Judge Stone to specifically satisfy himself on the subject by personal inquiry. Surely we may assume that Judge Stone would not have positively stated in his affidavit that the Deputy Attorney General told him “on at least one occasion in chambers that no criminal action would be filed by the State in this matter” if in fact no such representation had been made.

I will not burden this dissent with factual background and detail concerning the Utah litigation and the assignment of the zip nut patent to Crescent Products Corporation, as they are sufficiently set forth in the majority’s opinion.

I emphasize at this point that I impute no wrongdoing to attorney Gentile who was representing Zip Nut, Inc. He had been engaged by Schell to achieve a result that would inure to the benefit of Zip Nut and Schell, as undoubtedly relayed to Gentile. Moreover, since we do not have actual facts of the disclosures made to Pridham by Schell through Gentile or otherwise, I do not pejoratively characterize Schell’s behavior other than to note that it has all the appearances of conduct calculated to prejudice his former client, Fullerton, to Schell’s eventual pecuniary advantage.

Specifically, Pridham stated to Judge Agosti, rather inexplicably:
MR. PRIDHAM: And if the defendants are going to make an issue of their lack of notice, or knowledge of all of the State’s intention to criminally prosecute them, I personally can testify that on June 18th, 1992, when I came to Reno to file my criminal Complaint, when I did come to the civil hearing to observe Mr. Sourwine specifically and pointedly ask me if there were going to be any criminal charges brought against both of his clients, Miss Bennett and Mr. Fullerton. And both the defendants were within earshot, curiously and eagerly waiting my response.
I informed Mr. Sourwine at that point that we don’t confirm or deny the investigation, we don’t notify people in advance when — except for notice of Indictment.
THE COURT: Wait a minute, the day you filed . . . the complaint you wouldn’t tell them you did that?
MR. PRIDHAM: I hadn’t filed it yet.
THE COURT: You were intending to?
MR. PRIDHAM: Right.
Contrary to the implications at the beginning of his statement, Pridham’s comments would seem to establish that respondents did not, in fact, have notice or knowledge of the State’s intentions with regard to criminal charges being brought against them as late as June 18, 1992, and that the State’s representatives continued to refuse to inform them of any such intentions on the very day that the charges were filed.